HVAW, A Limited Partnership, and
Bill C. Hunter, Plaintiffs,

v.

AMERICAN MOTORISTS INSURANCE
COMPANY and David E. Lee,
Defendants.

Civil No. 3:96–CV–1836–H.

United States District Court,
N.D. Texas,
Dallas Division.

July 1, 1997.

Bill C. Hunter, Law Office of Bill C. Hunter, Dallas, TX, for plaintiffs.

Veronica Marie Czuchna, Zelle & Larson, Dallas, TX, for defendants.

*MEMORANDUM OPINION AND ORDER*

SANDERS, Senior District Judge.

The case is before the Court on cross-motions for summary judgment. Plaintiffs filed their Motion for Partial Summary Judgment on February 6, 1997. Defendants filed their Motion for Summary Judgment on May 2, 1997. The Court has received response and reply briefs in connection with both motions. To a large extent, the issues in the two motions overlap and they will be discussed and ruled on simultaneously.[1]

## I. Factual Background

This coverage dispute involves two insurance policies issued by American Motorists Insurance Company ("AMICO") to the law firm of Hunter, Van Amburgh & Wolf, P.C. ("HVAW–PC"). The principal question before the Court is whether AMICO had a duty under those policies to defend HVAW–PC and Bill C. Hunter ("Hunter") in two adversary proceedings in the U.S. Bankruptcy Court in this District.

### A. The Insurance Policies

Defendant AMICO issued the two insurance policies to HVAW–PC in October 1992. The first was a Commercial General Liability (CGL) policy, which was renewed for additional one-year terms in October 1993 and again in October 1994. The second policy was a Commercial Catastrophe Liability (CAT) policy, which was renewed for an additional one-year term in October 1993. It is undisputed that HVAW–PC was the named insured and that at all relevant times Hunter was either defined as an insured under the terms of the policies or was named an additional insured.

### B. Events Underlying the Bankruptcy Proceedings

In the late–1980s and early–1990s, Hunter and HVAW–PC provided legal representation to various individuals and business entities associated with Gary and Grady Vaughn (the "Vaughn entities"). As part of a complex financing transaction, the Vaughn entities entered into agreements with Legal Econometrics, Inc. (LEI) and its president, Malcolm Kelso. Under the agreements, LEI and Kelso were given ownership interests in and control over various Vaughn entities. Disputes soon arose as a result of these transactions. In one such dispute, Hunter, acting as attorney for the Vaughn entities, filed a lawsuit in New Mexico in January 1992, and quickly obtained a default judgment against Kelso. In April 1993, the Vaughn entities assigned this judgment to Hunter, who undertook registration and enforcement of the judgment in Texas. As part of those and other collection efforts, Hunter initiated Texas proceedings for turnover and injunctive relief that resulted in the freezing of LEI's assets. This freeze, along with other litigation involving Vaughn entities, apparently contributed substantially to LEI and Kelso declaring bankruptcy.

Once in bankruptcy, LEI and Kelso initiated two adversary proceedings against Hunter and HVAW–PC. The first adversary proceeding[2] raised a laundry-list of causes of action including conspiracy, fraud, conversion, legal malpractice, and violations of the Texas Deceptive Trade Practices Act and federal racketeering law. The second adversary suit[3] alleged that Hunter and HVAW–PC violated the automatic bankruptcy stay of the first suit by seeking enforcement of the New Mexico judgment and other Texas judgments. The second adversary action also

---

1. Both motions were filed with HVAW, A Limited Partnership ("HVAW–LP"), identified as the sole plaintiff. On May 28, 1997, the Court entered an order realigning Bill C. Hunter as a plaintiff because, throughout this litigation, Hunter's interests have been aligned with those of HVAW–LP. Since at least October 24, 1996, Hunter, an attorney, has represented both HVAW–LP and himself in this litigation. Moreover, following the realignment, Hunter and HVAW–LP have filed joint briefs in connection with the two motions before the Court. The

Court will treat all motions and briefs signed by Mr. Hunter, irrespective of their captions when filed, as representing the actions and positions of both current Plaintiffs.

2. *Legal Econometrics, Inc., et al. v. Chama Land & Cattle Co., et al.*, Adv. No. 393–3585–HCA.

3. *Legal Econometrics, Inc. and Malcolm Munro Kelso v. James Scarantino, et al.*, Adv. No. 393–3668–HCA.

alleged legal malpractice, breach of fiduciary duty, and conspiracy to defraud. Central to both adversary proceedings was the allegation that Hunter and HVAW–PC, acting in concert with the Vaughn entities, engaged in a complex conspiracy to defraud LEI and Kelso.

### C. Hunter's and HVAW–PC's Request for a Defense

Hunter and HVAW–PC contacted AMICO to request that the insurer provide them a defense in the bankruptcy proceedings under the firm's CGL and CAT policies. AMICO refused to provide a defense on the basis that the claims raised in the adversary proceedings were not covered by these commercial policies. David Lee, an individual Defendant here, was the claims manager primarily involved in the denial of Hunter's and HVAW–PC's request for coverage. Lee is employed by Lumberman's Mutual Casualty Company, a sister corporation of AMICO which performs claims adjusting services for AMICO.

In October 1994, the Bankruptcy Court approved a settlement of the adversary proceedings that involved a substantial payment by HVAW–PC's professional malpractice insurer, National Union. Hunter and HVAW–PC maintain that they were forced to accept this settlement by AMICO's refusal to provide them a defense in the bankruptcy cases. Before the settlement, in March 1994, HVAW–PC and Hunter formed a new entity—HVAW/Hunter Partnership (the "General Partnership")—to direct their defense of the adversary proceedings. HVAW–PC and Hunter individually assigned any and all claims they had under the AMICO policies to the General Partnership. In March 1995, the General Partnership assigned the claims against AMICO to another new entity: HVAW, a Limited Partnership ("HVAW–LP"), which is a Plaintiff here. Sometime in early 1997, after this case had been pending for several months, HVAW–LP apparently re-assigned its interest in the claims against AMICO to the General Partnership. Despite this *pendente lite* transfer, the Court denied a motion to substitute the General Partnership as Plaintiff in place of HVAW–LP. *See* Order filed May 28, 1997. AMICO has never given written consent to any of these transfers.

## II. Analysis

Following the settlement of the bankruptcy proceedings, Plaintiffs initiated this lawsuit to recover the cost of their defense in those adversary actions. Plaintiffs allege in their Amended Complaint that AMICO's and Lee's failure to investigate, defend, and settle the bankruptcy cases constituted a breach of the two insurance contracts. Plaintiffs further allege that these same failures constitute a breach of the duty of good faith and fair dealing, as well as constituting negligence. Plaintiffs allege that Defendants, including Lee individually, made various misrepresentations with respect to the insurance policies and that these misrepresentations, as well as Defendants' other acts, violated the Texas Insurance Code and the Texas Deceptive Trade Practices Act (DTPA). Finally, Plaintiffs maintain that Defendants' conduct amounted to gross negligence justifying the imposition of exemplary damages.

Defendants have moved for summary judgment on all these claims. Both sides have sought summary judgment on the issue of whether, under the terms of the CGL and CAT policies, AMICO had a duty to provide Hunter and HVAW–PC a defense in the adversary proceedings brought by LEI and Kelso.

### A. Plaintiffs' Claim for a Defense in the Bankruptcy Proceedings

■■■ Under Texas law, an insurer's duty to defend is determined by examining the insurance policy and pleadings in the underlying lawsuit. The duty to defend arises only when a third party sues an insured on allegations that, if they were true, would potentially create a claim under the policy. *Gulf Chem. & Metallurgical Corp. v. Associated Metals & Minerals Corp.*, 1 F.3d 365, 369 (5th Cir.1993). Plaintiffs maintain that the bankruptcy proceedings against Hunter and HVAW–PC triggered AMICO's duty to defend because the adversary suits contained allegations that, if true, would fall within the coverage of the two policies.

### 1. The CGL Policy

■ The AMICO CGL policy provides coverage for "bodily injury" and "property damage" that is caused by an "occurrence." An "occurrence" is further defined by the policy as an "accident, including continuous or repeated exposure to substantially the same general harmful conditions." Texas courts have construed "accident" in this type of policy to mean "an unexpected, unforeseen or undesigned happening or consequence." *Travelers Ins. Co. v. Volentine,* 578 S.W.2d 501, 503 (Tex.Civ.App.-Texarkana 1979, no writ). An injury is "accidental" if it is "not the natural and probable consequence of the action [which produced it]." *Republic Nat'l Life Ins. Co. v. Heyward,* 536 S.W.2d 549, 557 (Tex.1976).

■ Here, the complaints in the adversary proceedings allege primarily intentional and voluntary conduct by Hunter and HVAW–PC, including conspiracy, fraud, breach of duty, and the filing of lawsuits and other actions to enforce judgments against LEI and Kelso. These alleged events in no way qualify as an "accident." Applying Texas caselaw, the Fifth Circuit has held that damage is not accidental "where the insured's act is voluntary and intentional and the injury is a natural result of the act, even though the injury may have been unexpected or unintended." *See Cornhill Ins. PLC v. Valsamis, Inc.,* 106 F.3d 80, 88 (5th Cir.1997) (construing *State Farm Fire & Cas. Co. v. S.S.,* 858 S.W.2d 374 (Tex.1993), and *Argonaut Southwest Ins. v. Maupin,* 500 S.W.2d 633 (Tex. 1973)), *petition for cert. filed,* 65 U.S.L.W. 3839 (U.S. June 9, 1997) (No. 96–1966). The acts ascribed to Hunter and HVAW–PC in the bankruptcy proceedings were clearly voluntary and intentional. Moreover, it was natural and foreseeable that LEI and Kelso would suffer financial harm as a result of these alleged acts. The fact that Hunter and HVAW may not have foreseen that this financial harm would result in LEI entering bankruptcy does not mean that this injury was "accidental." *See Meridian Oil Production, Inc. v. Hartford Accident & Indem. Co.,* 27 F.3d 150, 152 (5th Cir.1994) (holding that where result of an insured's action was predictable, the fact that extent of monetary damage may have been unexpected does not make the event an "occurrence"). Therefore, none of the intentional acts alleged in the adversary proceedings constitutes an "occurrence" covered by the CGL policy that would trigger AMICO's duty to defend.

■ Plaintiffs further argue that, in addition to intentional acts, the bankruptcy proceedings contain allegations of negligence sufficient to trigger coverage under the CGL policy. Specifically, Plaintiffs observe that the adversary complaints bring a claim for legal malpractice based on allegedly negligent legal advice and representation that Hunter and HVAW provided to LEI and Kelso. Although the bankruptcy court later found the legal malpractice claim to be completely unfounded, Plaintiffs maintain that the presence of a negligence allegation was sufficient to trigger AMICO's duty to defend. However, it is apparent from a complete reading of the adversary complaints that the alleged acts of legal malpractice were part and parcel of the broader conspiracy to defraud alleged against Hunter and HVAW–PC. The Fifth Circuit has repeatedly construed Texas insurance law as holding that, where liability premised on negligence is related to and interdependent with other tortious activities, the "ultimate issue" in a duty-to-defend case is whether the other tortious activities themselves constitute an "occurrence." *Cornhill,* 106 F.3d at 87; *Columbia Mut. Ins. Co. v. Fiesta Mart, Inc.,* 987 F.2d 1124, 1128 (5th Cir.1993). Since the negligence alleged in the bankruptcy complaints is merely one aspect of a larger, allegedly fraudulent conspiracy, such negligence does not constitute a separate "occurrence" under the CGL policy.

Therefore, since the bankruptcy proceedings did not allege an "occurrence" under the CGL policy, the Court concludes that AMICO had no duty to defend Hunter and HVAW–PC under that policy.[4]

---

4. Since the Court finds no "occurrence," the Court does not reach the issues of "bodily injury," "property damage," the applicability of coverage exclusions, or the question of whether the acts complained of fell within the policy term.

### 2. "Products–Completed Operations Hazard" Within the CGL

In their Partial Motion for Summary Judgment, Plaintiffs also argue that AMICO was required to defend Hunter and HVAW–PC in the bankruptcy suits because the legal services at issue there fell within the CGL's definition of a "products-completed operations hazard." Coverage for such operations hazards generally applies to construction activities, maintenance, and related trades. While tacitly conceding this general meaning, Plaintiffs maintain that, in the absence of specific language excluding professional services, legal advice falls within the CGL policy's definition of "products-completed operations hazard." The Court disagrees and concludes that, under a plain reading of the policy, the legal services provided by Hunter and HVAW–PC do not fall within the CGL definition of "products-completed operations hazard." Therefore, AMICO had no duty to defend under that provision of the policy.

### 3. The CAT Policy

Plaintiffs also maintain that AMICO had a duty under Coverage B of the CAT policy to defend or reimburse the defense costs incurred by Hunter and HVAW–PC in the adversary proceedings.[5] As did the CGL policy, Coverage B of the CAT policy provides coverage for "bodily injury" and "property damage" caused by an "occurrence." For the same reasons that the Court found no "occurrence" above, the Court concludes that the adversary proceedings did not allege an "occurrence" for purposes of bodily injury or property damage protection under Coverage B.

Plaintiffs further argue, however, that Coverage B additionally provides coverage for "personal injury" without the requirement of an "occurrence." Plaintiffs maintain that the adversary complaints alleged that Hunter and HVAW–PC were liable for malicious prosecution, which is defined as a form of "personal injury" under Coverage B. In response, AMICO argues that an endorsement to the CAT policy excludes all coverage for "personal injury." The language of the CAT form policy provides that:

> [AMICO] will pay those sums that the insured becomes legally obligated to pay as damages, because of 'bodily injury,' 'property damage,' 'personal injury' or 'advertising injury' to which this insurance applies....

A policy endorsement entitled "Exclusion—Personal and Advertising Injury" amends that provision of the form policy to read:

> [AMICO] will pay those damages that the insured becomes legally liable to pay as damages because of 'bodily injury' and 'property damage' to which this insurance applies....

Thus, the Exclusionary Endorsement removes "personal injury" damages from the kinds of casualty covered under Coverage B. However, another policy endorsement, entitled "Texas Amendatory Endorsement," also purports to replace the original language of CAT form policy with the following provision:

> [AMICO] will indemnify the insured for those sums that the insured becomes legally obligated to pay as damages, because of 'bodily injury,' 'property damage,' 'personal injury' or 'advertising injury' to which this insurance applies....

Obviously, "personal injury" is once again listed in the recitals of coverage. However, the central thrust of the Texas Amendatory Endorsement is to make clear that the insurer has the *option,* to either defend covered claims itself or reimburse the insured for defense costs incurred on covered claims.

Plaintiffs maintain that the Texas Amendatory Endorsement works to reinstate the personal injury coverage purportedly deleted by the earlier Exclusionary Endorsement. At the least, Plaintiffs argue that the varying language in the two endorsements creates a ambiguity as to whether personal injury coverage is provided by the policy, thereby precluding summary judgment The

---

**5.** Coverage A of the CAT policy provides excess coverage for claims that exceed the limits of the underlying CGL policy. Plaintiffs do not appear to argue that AMICO had a duty to defend or indemnify under Coverage A. In any event, since the Court has found that there was no coverage under the CGL policy, AMICO could have no defense or indemnity obligation under Coverage A of the CAT policy.

Court disagrees. The Court concludes that the obviously different purposes of the two endorsements allows them to be read together without any ambiguity. The purpose of the Texas Amendatory Endorsement is to modify the language of CAT form policy to give AMICO the option, rather than the duty, to defend covered claims. The purpose of the Exclusionary Endorsement is to completely exclude "personal injury" and "advertising injury" from coverages under the CAT policy. The fact that the Texas Amendatory Endorsement mentions "personal injury" as part of its recitations in no way undermines the specific and unambiguous exclusion of "personal injury" coverage effected by the Exclusionary Endorsement.

Since the bankruptcy proceedings alleged no "occurrence," and since the CAT policy provided no coverage for "personal injury" complaints, the Court concludes that AMICO had no duty under the CAT policy to defend or indemnify Hunter and HVAW–PC.

### B. Plaintiffs' Remaining Claims

Defendants have also moved for summary judgment on the other contractual and non-contractual claims asserted by Plaintiffs in this action. Plaintiffs have presented no response to the motion for summary judgment on these additional claims and have not identified any disputed issues of material fact in relation to these claims.

#### 1. Failure to Investigate, Defend, and Settle

Plaintiffs' Amended Complaint alleges that Defendants' failure to investigate, defend, and settle the claims against Hunter and HVAW–PC constitutes a breach of the insurance contracts, a breach of the duty of good faith and fair dealing, violations of the Texas Insurance Code and DTPA, and negligence. These claims are without merit.

 Under Texas law, the contractual obligations to defend and indemnify the insured give rise to a duty on the part of the insurer to accept reasonable settlement demands within policy limits. See G.A. Stowers Furniture Co. v. American Indem. Co., 15 S.W.2d 544 (Tex. Comm'n App.1929, holding

approved). However, the insurer has no contractual or implied duty to settle a claim that is not covered under the policy. See American Physicians Ins. Exchange v. Garcia, 876 S.W.2d 842, 848 (Tex.1994). Therefore, AMICO breached no duty in failing to settle the uncovered adversary claims against Hunter and HVAW–PC. Furthermore, summary judgment is appropriate on the question of whether AMICO violated its duty to settle because Plaintiffs have identified no summary evidence that a settlement demand within the policy limits was presented to AMICO. See id.

 Moreover, the Texas Supreme Court has recently held that an insurer owes no duty of good faith and fair dealing to investigate and defend claims against its insured. Maryland Ins. Co. v. Head Indus. Coatings & Servs., Inc., 938 S.W.2d 27 (Tex. 1996). The only duty recognized by Texas law in the context of investigation, defense, and settlement of claims is the Stowers duty to accept reasonable settlement offers. Id. at 28. Therefore, the Court concludes that Plaintiffs' contractual and tort claims based on AMICO's alleged failure to investigate, defend, and settle the adversary cases fail as a matter of law. Nor do AMICO's alleged failures violate the Texas Insurance Code or the DTPA. See Garcia, 876 S.W.2d at 846–47 & n. 8; Gulf States Underwriters v. J.T. Wilson, 753 S.W.2d 422, 430 (Tex.App.-Beaumont 1988, writ denied) (simple breach of an insurance contract cannot constitute a violation of the Insurance Code or the DTPA)

 Finally, with respect to Defendant Lee, he was not a party to any contract with HVAW–PC or Hunter and, therefore, had no contractual duty toward them. Moreover, in his role as a claims manager and adjuster, Lee had no "special relationship" with AMICO's insureds that would give rise to a duty of good faith and fair dealing in the performance of claims-handling services. Natividad v. Alexsis, Inc., 875 S.W.2d 695, 698 (Tex.1994).

#### 2. Alleged Misrepresentations

Plaintiffs' Amended Complaint also alleges that three misrepresentations by AMICO and Lee constituted violations of the Insur-

ance Code and the DTPA. First, Plaintiffs allege that Lee repeatedly misrepresented the scope of coverage under the policies by maintaining that personal injury and professional malpractice coverage was not included. Second, Plaintiffs allege that Defendants led them to believe that Lee was an AMICO employee, when he is in fact employed by AMICO's sister company, Lumberman's Mutual. Finally, Plaintiffs allege that Defendants represented that AMICO itself, not Lumberman's, would handle claims adjustment functions under the policies.

 As to the first alleged misrepresentation, the Court's construction of the policy, given above, indicates that Lee's representation as to the exclusion of personal injury coverage was in fact correct. In any event, a misrepresentation of the terms of a contract itself does not give rise to a cause of action under the Insurance Code or the DTPA. *Escajeda v. Cigna Ins. Co.*, 934 S.W.2d 402, 407–08 (Tex.App.-Amarillo 1996, no writ). Moreover, in order to be actionable under the Insurance Code or the Texas DTPA, a misrepresentation must be material. *See Higginbotham & Assocs., Inc. v. Greer*, 738 S.W.2d 45, 49 (Tex.App.-Texarkana 1987, writ denied). Plaintiffs' brief makes no attempt to present evidence that any of the alleged misrepresentations was material—that is, that they induced HVAW–PC or Hunter to enter the insurance contract or were the producing cause of Plaintiffs' alleged injury. Therefore, summary judgment on the Insurance Code and DTPA claims is appropriate.

### III. Conclusion

For the reasons outlined above, Plaintiffs' Partial Motion for Summary Judgment is **DENIED** and Defendants' Motion for Summary Judgment is **GRANTED** as to all of Plaintiffs' claims. Judgment will be entered separately.

SO ORDERED.